## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 23-CR-261(APM)** |
| | **:** | |
| **Terry Allen,** | **:** | |
| **Defendant.** | **:** | |

### DEFENDANT'S SENTENCING MEMORANDUM

I.      INTRODUCTION

Mr. Allen is a simple man who lives in the mountains of Pennsylvania. He works with his hands and the dirt of this land to support his family and honor his God. As an adult, Mr. Allen has tried to do the right thing. After some bumps in the road in his youth, he has sought to make his life about honoring his faith and supporting his family. He has tried to make sense of the world through the lens of this faith as well. The defense asks this Court to, for a moment, step outside the J6 government scripted narrative and look at the facts of this case. Mr. Allen, a person who is peaceful, hardworking and concerned about America's future, came to DC to ask questions and find answers about what happened during the election of 2020. His daughter had been a poll worker in the swing state of Pennsylvania and had witnessed firsthand irregularities in the counting of ballots in her precinct. In December of 2020, Mr. Allen came to DC to march on Washington, along with thousands of others, and attempt to raise awareness of these irregularities in an

election President Trump himself believed to be stolen.  Mr. Allen didn't come to assault officers, fight with anyone or riot in December of 2020 or January of 2021. He wore the same gloves and the brought the same flagpole on December 2020 that he had on January 6th.  He wasn't there to assault police officers,  interrupt Congress or stop the vote.  What Mr. Allen experienced at the December rally was what he expected in January.  In December he stood at the steps of the Capitol, listened to testimonies of others who believed their votes were not counted and told his own story as well.  The Court may recall the video entered into evidence at trial where Mr. Allen is standing on the Capitol Grounds in December. *See* photo below from Gov. Ex 306.



*Figure 1- Gov.ex 306 Mr. Allen in December of 2020 on Capitol Grounds*

The  grounds of the Capitol were not closed on that December day.  People were freely walking around within eyesight of Capitol Police who stood peacefully on the side.  In December, Mr. Allen and others were allowed to exercise their First Amendment rights on Capitol Grounds.  On January 6th, the Court found that the situation was much different.  The grounds had been closed and a different set of boundaries had been established.  But for Mr. Allen, his previous experience made it difficult for him to see why he could not be closer to the building and join the others who had moved forward to be heard and express their views.

Mr. Allen expected J6 to be peaceful but knew there was a possibility that Antifa would come to harass Trump supporters as they had at prior gatherings.  As this Court heard during this trial and in other trials, the protest on January 6th turned into an unmanageable mob and riot.  Mr. Allen was not at the front of the line that overran barricades.  He followed others after it appeared the police were retreating back to the building.  At that moment, Mr. Allen made a poor decision to follow the crowd closer to the lower west terrace area.  He stood on a wall and watched others engage with officers and the officers retreat further back.  Then the crowd moved more fencing and made their way closer.  Mr. Allen walked through an opening made by these rioters and moved closer as well.  Again, he was not the leader, but a follower.  Mr. Allen should be sentenced for his conduct and his

conduct alone-not the conduct of the other defendants.[1]  The conduct of the mob does not reflect Mr. Allen's intentions that day, which were to express his first amendment views on the election as he had done previously.  The actions of violent people standing near Mr. Allen in the crowd created chaos and danger not only for the police but also for other rioters.  In fact, Mr. Allen was pushed to the ground by others in the crowd.  The chaos made it difficult for Mr. Allen to know where to go for safety and put him in a defensive mode in an attempt to avoid being shoved to the ground again.   The bad actors he stood near that day created situations in which Mr. Allen could not easily escape and ultimately caused him to be pushed down, lose his hand-held device and get sprayed directly in the eyes with OC spray.  Mr. Allen has spoken about his remorse in being caught up in this situation and holds himself accountable for his actions on January 6, 2021.

II.    <u>OBJECTIONS TO THE PSR</u>

After carefully reviewing the PSR with Mr. Allen, the defense filed certain objections with the probation officer and emailed a letter with the details of those objections.  The Final Presentence Report details the objections that have been resolved and any outstanding matters to be resolved by the Court.  *See* Final PSR ECF  No. 58 at page 27.

---

[1] Only the most relevant facts will be repeated since the Court heard the trial.

Mr. Allen objected to the fact that he was not given the Zero Point Offender Reduction.  The PSR consistently refers to Mr. Allen's use of a flagpole to interfere or obstruct officers.  This Court found Mr. Allen not guilty of this count and the government cannot now claim a different theory regarding this conduct to, in effect, punish him for conduct this Court has held was not proven at trial.  As this Court noted, the videos, which constituted the majority of evidence presented at trial, were inconclusive as to the angle and trajectory of the flagpole.   To now argue, without evidence, that there were victims of an assault with that flagpole is fundamentally dishonest.  If the government didn't feel confident in the truthfulness of this "victim" testimony enough to put the purported victims on the stand at trial, then this Court should not now accept this testimony as reliable or credible.

The Commission promulgated the zero-point offender provision in recognition of low recidivism rates of first time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." [2] The Commission has identified crimes that are violent or otherwise serious and the conviction here does not fall under the exclusions. In other words, his conduct does not fall within one of the enumerated exclusions to application of this provision. Mr. Allen meets all of these criteria. *See* U.S.S.G. 5C1.1; 28 USC 994(j). In order

---

[2]Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 *(citing* 28 U.S.C.Section 994(j)).

for a crime to be violent in nature, courts have determined that to qualify as "using violence," one must "use physical force with the intent to injure[.] *United States v. Pineda-Duarte,* 933 F.3d 519, 523 (6th Cir 2019). And "credible threats of violence" require one to credibly "express an intention to inflict pain, harm, or punishment" through violence. *See United States v. Hernandez Barajas*, 71 F.4th 1104, 1107 (8th Cir. 2023). The evidence here does not show Mr. Allen used violence or a credible threat of violence, nor did he have intent to injure anyone. This Court found that he reflexively threw a piece of fencing after being sprayed in the eyes.  The time lapse between the two events was less than a second.  The ability to formulate an "express intention" to inflict pain or harm to anyone in particular could not have existed.

Other judges in this courthouse have applied this adjustment with conduct much worse than Mr. Allen's. *See U.S. v. Yang*, No 23-CR-100(JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024)(granting 4C1.1 adjustment where defendant grabbed an officer's wrist during a scuffle and was part of a crowd that did not depart in the face of advancing police line). This Court has also rejected the government's argument that just because an individual defendant who was part of a crowd that engaged in violence but who did not himself engage in violence is ineligible for the reductions. *See United States v. Parks*, 21-CR-411 (APM). There, the government argued that because the defendant was at the "front of a crowd rush" and was

"aware of [violence]," that the adjustment did not apply. This court reasoned that the defendant's conduct "did not result in death or serious bodily injury" and the defendant "did not use violence or credible threats of violence." [3] Judge Bates[4] has also rejected this use of violence in not imposing the plus 3 levels under GL 2A2.4(b)(1). *See also, United States v Hunter Palm*, No. 1:21-cr-00393 (RDM)(Judge Moss gave the reduction).

Mr. Allen also objected to paragraph 45 and the characterization of the object ("a metal pole") he threw as a "dangerous weapon." There was absolutely no evidence about the characteristics of the object that he threw. There is no evidence of what it was made out of, what it weighed, how long it was, how thick it was, or if was malleable. The government did not even attempt to bring any physical evidence for the Court to examine. According to Application Note 1 for U.S.S.G. § 2A2.2, a dangerous weapon is defined as an object capable of causing bodily harm, but the intent to use the object as a weapon is essential for applying the enhancement. This supports the argument that mere possession or incidental handling of objects like a flagpole or construction marker does not automatically satisfy the criteria for this enhancement. The guidelines require that the object be

---

[3] *See* Transcript of Sentencing, Tr. at 38.
[4] *See U.S. v. Hazelton*, 21 CR 30 (JDB).

wielded in a manner indicating a deliberate attempt to cause bodily harm. There was no such intent on Mr. Allen's part but rather an instinctive reaction.

Further, the language in Application Note 1 clarifies that even if an object could be potentially harmful, the enhancement is only appropriate when the intent to harm with the object is evident, distinguishing incidental handling from intentional weaponization.

Based on this guideline, Mr. Allen's incidental handling of the flagpole and pole in a chaotic environment would not meet the threshold for "dangerous weapon" designation without evidence of intent to inflict harm. This clarification strengthens the argument to challenge the enhancement by highlighting that his actions did not rise to the standard of purposeful weapon use required by § 2A2.2(b)(2).

Unlike defendants who engaged directly with officers, physically assaulted them, or attempted to push past barriers, Mr. Allen's interaction with law enforcement was minimal and incidental rather than confrontational. He did not participate in pushing against police lines, using objects to strike officers, or verbally inciting others to do so. His behavior falls short of the kind of direct assaults that have led to several sentences for other January 6 participants.

Mr. Allen objected to paragraphs 25 and 47 in which the government has now brought forward two officers, who they did not see fit to have testify at trial, to attempt to establish the victim related adjustment and a six point enhancement under the guidelines.

Paragraphs 25 and 47 - Defense stated there was no testimony from individual officers at trial nor was any victim identified. Defense also objects to the six-point enhancement.

Probation Officer's Response – The Government reported Retired USCP Sgt. Aquilino Gonell and current USCP Officer David Callaghan identified themselves as among the officers at whom defendant Allen jabbed his flagpole. In regards to the six point enhancement, as found in the Court's verdict, defendant Allen attacked uniformed USCP and MPD officers with a metal pole, and he also interfered or obstructed USCP officers using a wooden flagpole. Based on the aforementioned, there have not been any revisions to the report concerning this objection.

*Figure 2- Final PSR page 28 objections by Defendant*

These Officers should not be believed. Plain and simple. Had the government really believed Mr. Allen to have assaulted them with a flagpole, the government would have brought them to testify at trial. They did not.

Of particular interest is the fact that Officer David Callaghan sat in the hallway during this trial. Officer Callaghan was subpoenaed by the defense. The government was well aware of his presence and asked repeatedly for him to be released from his subpoena during the course of the day. If he was a victim, why didn't the court hear from him? Because, in no report or interview had he ever stated that Mr. Allen attacked him with a flagpole. To the contrary, this officer identified Matthew Beddingfield as the sole person with a flagpole who attacked

the line of officers.  Callaghan's recollection was provided in support of the guilty plea in Mr. Beddingfield's case.  *See* 22-cr-66 (CJN), ECF  No. 40, Statement of Offense.   The fact that the government did not call him, despite him being available to give testimony should tell this Court all it needs to know about the confidence the government has in this new story of how Mr. Allen was the perpetrator of the assault.

Officer Gonnell's account is far more complicated and should give this Court serious pause.  This officer has taken the events of January 6th, as obviously traumatic as they were for many officers, and made his experience a media circus, garnering a book deal and television career out of claiming a victim status.  The fact that he has also used his social media accounts to prejudice J6 defendants, create pretrial negative publicity and to continually shame  all J6 defendants should be enough to discredit anything he says.   The government could have  called him at trial.  But they didn't and that should be enough for this Court to know his testimony would have not been supported by the evidence.  Indeed, the evidence that this Court heard showed not only that Mr. Allen had his flagpole pointed at the ground, but that officers who saw the episode live at the time had every opportunity to identify Mr. Allen as the perpetrator but instead, identified Matthew Beddingfield.

This Court should not use either of these officers' unsupported statements to enhance the penalties for Mr. Allen.  Additionally, the hypothetical victim of the assault with the thrown fencing pole should not count under this enhancement. First, it was never proven at trial that pole hit anyone because it didn't hit anyone. Second, the government's only evidence showed that the pole "possibly" changed directions, not that it hit anyone.   The government had, and still has, access to every one of the officers who were there that day.  They could have easily presented officer testimony, if it was true, that the pole actually hit someone or was intended to hit someone.[5]  There is no proof whatsoever for this court to conclude that any officer was a victim of that pole being thrown or was targeted as such.

Under U.S.S.G. § 3A1.2(b), the "Official Victim" enhancement applies when a defendant commits an aggravated assault creating a substantial risk of serious bodily injury, specifically targeting law enforcement based on their official status. Application Note 4(A) specifies that the enhancement should apply only to actions akin to aggravated assault, where there is clear intent to cause serious harm. Incidental or indirect interactions that occur without targeted aggression do not meet this threshold, a standard supported by case law and commentary within the guidelines.

---

[5] For example, the government could have called the officer that sprayed OC spray in Mr. Allen's eyes to testify about what he saw. They didn't.

The *United States v. Sampson*, 41 F. App'x 112 (9th Cir. 2002) decision is particularly relevant for disputing the "Official Victim" enhancement in this case. In *Sampson*, the Ninth Circuit vacated an enhancement under U.S.S.G. § 3A1.2(b) because Sampson's actions did not meet the standard for an "assault" on a law enforcement officer as required by the guideline. The court found that, although Sampson had fired a weapon while fleeing a robbery, there was no intent to harm the officer, nor did his actions cause the officer to feel immediate apprehension of harm, both of which are necessary elements for the enhancement.

In *Sampson*, the court emphasized that for an "Official Victim" enhancement to apply, there must be a clear *intent to cause harm* or actions that create a *reasonable apprehension of immediate bodily harm*. Sampson did not intend to injure the officer, and the officer was unaware of the gunshot, eliminating any immediate apprehension. Likewise, this case, his interactions with law enforcement—such as throwing a pole—were reactionary in a chaotic crowd and lack the specific intent to harm required by § 3A1.2(b).

*Sampson* highlighted that the "Official Victim" enhancement under **§ 3A1.2(b)** applies only when conduct is tantamount to aggravated assault, meaning it involves a dangerous weapon with intent to cause harm or serious injury. The district court explicitly found that Sampson's actions did not constitute aggravated assault since he lacked intent to injure the officer. Similarly, Mr. Allen's

behaviors— throwing the pole—are insufficient to meet the aggravated assault

standard. His actions did not carry an intent to inflict harm but were instead

spontaneous responses influenced by the environment, consistent with the

guidelines in Application Note 4(A).

      Pursuant to the United States Sentencing Guidelines (hereinafter "USSG"),

Mr. Allen  believes that the following Guideline sections apply:

| | |
|---|---|
| USSG 2A2.2(a):   Base offense level. | 14 |
| USSG 4C1.1: no criminal history | -2 |
| ADJUSTED OFFENSE LEVEL | 12[6] |

      Based upon these figures, and a criminal history category of I, Mr.

Allen's final guideline range is 10-16 months.

      For the reasons set forth herein, Mr. Allen requests that this Honorable Court

impose a sentence below the guideline range,  perhaps a period of home

confinement,  two years supervised release, 200  hours of community service and

$2,000 restitution to account for:

    1.      His lack of preparation or planning prior to January 6, 2021 to be

                part of the Capitol breach and his peaceful, non-destructive and

                non-violent behavior that and his sincere remorse in this regard;

    2.      His lack of bragging or posting on social media about what

                happened January 6;

---

[6] The probation office has calculated a level 26. *See* PSR, paragraph 50.

3.      His amazing commitment to his community and his family;

4.      His long history of a strong work ethic which has allowed him to

         be a productive and positive member of society; including his

         volunteer service to his community to include his current work for

         the Boy Scouts of America camp where he is providing excavating

         services for the camp pond.  *See* figure 3.



*Figure 3*

5.      The fact that he lost his very good job with a government

         contractor even before his trial and continues to suffer

         economically from his participation in January 6th: and

6.      That he and his family continue to be harassed as a result of false

         statements being posted about his involvement in the events at the

         Capitol.

## III.   <u>**Background**</u>

Mr. Allen lives in rural Pennsylvania and works his own mountainous property.  He also is a small business owner and operates an excavating business.  He has poured his life's work into the land he lives on to support his family.  He has been a lifelong resident of Pennsylvania.  His youth was marked by physical and mental abuse by his father which was tolerated by his family and put Mr. Allen on a path towards some destructive behaviors early on.  His childhood trauma resulted in self-medication, mostly with alcohol.  After his drinking resulted in his arrest in 1984, Mr. Allen stopped drinking altogether.  To his credit, he has maintained a sober and productive lifestyle for over 40 years.  During his sober journey he found his faith in a higher power and lives his life according to his deeply held religious beliefs.

He's been married for 46 years to the love of his life, Mrs. Mary Allen, and he worries greatly that if he is incarcerated for a long period of time his wife, who suffers from anxiety and back issues will not be able to maintain the rural property they live on.  Maintaining the furnace that heats the property is something Mrs. Allen cannot do because of her back issues.  Without reliable heat she cannot live in the only home they own.  He also worries that her income  alone will not be enough to support her if he were not able to work.  Mr. Allen has some health issues, particularly his back which has caused him to slow down considerably.

When this Court considers and compares the behavior of other J6 defendants the Court will find that Mr. Allen was cooperative with law enforcement throughout this process and has been cooperative since the beginning of this investigation. He sat down with FBI agent's early during the search and spoke with them over the course of hours. His pretrial and post-trial behavior was and is stellar. He has provided the government with everything they have asked for and continues to comply with all the monitoring obligations imposed by this Court. His probation officer noted too that Mr. Allen has had no compliance issues and continues to be careful to follow the rules set out by this Court willingly. Undersigned counsel has spoken to his probation officer multiple times who reports that he is a great person to supervise and would be an ideal candidate for home confinement.

### A. **Previous protests**

This Court can only understand why Mr. Allen came to D.C. to attend multiple protests after the 2020 election by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021 and thereafter. There is absolutely no evidence in this case to indicate he had plans to enter the Capitol, to stop the vote, or commit any violence that day. There is evidence, however, that Mr. Allen was concerned the election had been fraudulent in 2020

and that he felt it was important to journey to Washington DC on several occasions to have his voice heard.  Those prior occasions were peaceful and involved activities where speakers addressed not only election integrity concerns but also made appeals to Mr. Allen's faith-based support of President Trump.  These prior protests were peaceful and Mr. Allen felt a sense of purpose with like-minded Americans.  At no point did Mr. Allen think his protest activity was not legal or encouraged by our Constitution.

As we know now, the circumstances of J6 were different from those previous rallies for numerous reasons.  First, the government had restricted the Capitol grounds in a different way, making entry itself a crime.  Mr. Allen did not fully comprehend the situation, entering onto the grounds after he saw others do it and saw officers retreat further towards the stage.  The presence of so many people, doing the same thing, made it seem permissible, sort of like when the Tennessee fans stormed the field after the Alabama game a few weeks ago.  People know they aren't technically supposed to do it, but when the police move back and let people down on the turf it feels like you are allowed to be there.  In hindsight, he should have known not to move closer.  He should have processed the events differently.

It should be noted that by the time Mr. Allen arrived at the Capitol, crowds were gathering outside the fencing.  Officers were standing there, but not telling

people to move away.  Mr. Allen stood at the outskirts of the fencing.  He even tapped it with his flagpole.  It wasn't until he saw a large crowd move down towards the Peace Circle at 12:54pm that he assumed the flood gates have been opened and the police were retreating to allow the protestors access to the lawn area.  He witnessed the crowd move forward and minutes later followed the crowd himself to the Lower West Terrace.

Maybe he should have known following the crowd was wrong, but at the time the excitement of the crowd and the atmosphere led impulsivity to rule over common sense.  He walked on to the grounds thinking he was not doing anything different than when he had been on the grounds in December of 2020.  At that time he was able to get close to the Capitol, speak with video crews and wave his flag.

When this Court considers all of the factors before it, the Court must conclude that these are not the actions of someone there to overthrow the government or incite violence, but the actions of a man with a history of First Amendment activity who intended to participate in the expression of ideas rather than violence.

## B. __Mr. Allen's remorse__

Mr. Allen is very upset that people died that day, that people destroyed certain areas of the Capitol, and that police officers were attacked by the crowd. He is also justifiably upset that the police pummeled a non-violent crowd with

munitions.  He watched a man next to him get shot in the face with what appeared

to be a rubber bullet.  He saw and heard the flash grenades fired into the crowd.

He could smell the gas being used on the crowd.  This was so different from his

prior experience that he had no context for which to understand the police reaction.

In his prior trips to DC, the Capitol Police had stood to the side and let the people

chant, wave flags, even yell.   The Capitol Police let the people have their protest

but stood by without any aggressive response.  January 6th was not like that.   From

Mr. Allen's perspective, it was only when the police turned on the crowd with

munitions, rubber bullets and guns pointed from high above did pockets of

violence erupt.   People began to yell at the police line more aggressively and some

attempted to push back.

     Since that day, Mr. Allen has learned how horrible the day was for the

officers and has learned that others had already forced their way inside while he

was standing in the crowd.  Context for what was happening that day was only

learned after the fact by watching the news reports, like the rest of us.  His concern

for all those that died and were injured is sincere, and as he walked to the Capitol

grounds that day, he had no idea that the result would be that people would force

themselves up higher onto the inaugural stage and into the Capitol itself.  In fact,

Mr. Allen never even attempted to join the crowd up to the inaugural stage.  He

stayed only on the lower west terrace the whole time, an area he knew to be a

permissible area for First Amendment assembly in December when he was there. Thousands of rioters forced their way further towards the Capitol that day, stayed into the late evening hours, and battled police in the tunnel.  Mr. Allen did not.

   Mr. Allen did not rush the line, or charge at the officers either.  It was others who were forcing themselves into the face of officers at the line that afternoon at approximately 1:56pm when he is accused of throwing the fence rod.  This Court may recall that Mr. Allen held his flagpole in a defensive position to keep space from the people in front of him who were right at the line of officers and bike rack. He held a piece of black fencing in his hand but never waived it in the air, threatened anyone with it, or even made it visible.  If he had really wanted to assault the line at that time he had every opportunity to do so.  Instead, he stood there.  He watched others but kept his distance so as not to get pushed down by other rioters in front of him who were engaging with police.  The photo below in figure 3 from the Final PSR attempts to paint Mr. Allen as an aggressor with his flagpole pointed towards the officers at 1:56pm.   But the reality is he is not even close enough to touch the line with his 5ft flagpole.



*Defendant Allen pointing flagpole toward officers on West Plaza at 1:56pm*

*Figure 4*

The Court will recall that Mr. Allen stood several feet away (estimated by one officer to be approx. 6ft) from officers and that others in the crowd were directly in front of Mr. Allen and engaging with the officers.   In figure 5 below you can see the officer lift a cannister of OC spray and point directly towards the crowd.  There are several people closer to the line than Mr. Allen.



*Figure 5*

Did that Officer intend to spray Mr. Allen or someone else?  We don't know

because that officer was never a witness at trial.  Mr. Allen was nevertheless in the

pathway of the spray he unleashed.  His response to being sprayed was a "fight or

flight" response that kicked in instinctively.  He turned away at 13:56:41 and then

threw the fencing pole he held in his hand at 13:56:42.  That's a one second

elapsed time.  Was this enough time to even assess the situation let alone formulate

a plan?  Especially while blinded?  Mr. Allen argued at trial it was not.  In fact,

standing directly in front of Mr. Allen were not officers at all, but other rioters,

who would have been in the pathway of the rod.



*Figure 6*



*Figure 7*

Mr. Allen was also incapacitated and unable to see in that moment due to the spray, making it difficult, if not impossible, to make out who might be in front of him.   All he knew was he had been sprayed, point blank in the face, and it hurt, and he had not done anything to provoke it.  He immediately retreated into the crowd and sought help from others to contain the burning and wash out his eyes. He left the Capitol Grounds as soon as he could gather his strength and see to make his way out of the crowds.  Mr. Allen was not expecting to be attacked that day. He was expecting to be able to protest.  He was supporting everyday Americans' rights to assemble and speak and thought he was witnessing things as a bystander – not violent member of the mob that was pushing on officers in front of him

While he did not personally destroy anything, or intend to do anything but express his personal opinions on the day, his presence has been assessed as part of the mob's behavior.  According to Ed Maguire, a criminologist at Arizona State

University, security forces are trained to ignore yelled insults and small acts of

hostility, like pushes and thrown water bottles. And they receive training in

absorbing surges in a crowd, moving people as gently as possible, and quickly

responding to pockets of violence and isolating agitators.  Benedict Carey, Making

Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021), available at

https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html  Mr.

Allen  did not commit any of those actions towards police.  On January 6 there was

"[n]o clear structure in the crowd and absolute chaos on the police side: no clear

sense of credible incident command, of wearing the right gear, carrying the right

weapons. All of that seemed to be missing." Id.

      Importantly, as for persons in the mob "With no apparent structure or

strategy, the crowd had no shared goal or common plan." Id.  Dr. James Jasper, a

sociologist at City University of New York, noted, "Crowds do not act with one

irrational mind… There are many groups, doing different things, for different

reasons."  He further said, "There are great shots from the hall of statues, where

protesters stayed inside the velvet ropes, like tourists, looking around sort of in

awe." Id.

## IV.  LEGAL STANDARD

      Section 3553 of Title 18 of the United States Code enumerates certain

factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[7]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Allen

---

[7] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.   The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

Mr. Allen was a follower, not a leader. He  was not there to stop a vote or to interfere with anyone; that was never his intention. He simply went to DC to be a part of *the process*.  He understands that his decision to be a follower led him to participate in the actions of the group in pushing forward on the lower west terrace.

*Punishment for conduct of others*

Despite this acknowledgement of his own role in making these bad decisions, Mr. Allen should not be punished for decisions and/or violence perpetrated by other people, especially those with a clear intent and plan to attempt to injure or overrun the Capitol Police and MPD officers that day.

The video evidence reflects that at times Mr. Allen is being roughed up by the crowd himself.  At one point he is knocked down.  That action tells the Court that he did not intend to harm any officers as his intent was to survive the chaos himself.

Mr. Allen also did not steal or damage property that day. He stood there observing and trying to comprehend.  He was part of a crowd that turned violent. We now know, that by their mere presence, the crowd overwhelmed the police. But it should be considered that while others fought with police and tried to gain entrance further into the building, Mr. Allen did not.  There are also no Facebook posts, no texts to friends or family where Mr. Allen brags about his participation or claims to have acted to promote the violence in any way. Nothing. Most

importantly, he never intentionally touched an officer or had any physical contact with any law enforcement officials.

Ultimately, a better path would have been to leave the grounds altogether once he saw what was going on out in the crowd. At points in the day, especially earlier on the West Lawn, Mr. Allen did not have a clear understanding of what has occurring at other areas around the Capitol.  As the videos showed, the crowd on the lower west terrace had women, children and members of the media standing there.   Mr. Allen had a hard time processing the situation as clearly unsafe or illegal given the presence of such a diverse crowd.  Indeed, it was the police use of munitions on that diverse crowd that really made the situation seem bizarre.

What's critically missing from the evidence in this case, compared to other J6 cases,  is that Mr. Allen never says or texts or emails anyone that says he was there to stop the vote, knew a vote was taking place or that he ever contemplated obstruction of the Electoral College Certification.  He would never in a million years intentionally try to harm a police officer. In fact, it was never established at

trial that Mr. Allen had the intent to harm anyone, interfere with the certification at all or intended to engage in civil disorder.[8]

Yet here he is, a non-violent, 40 years sober, hard-working American - someone the government will argue should go to federal prison without taking into consideration the fact that he's been law abiding for the past 40 years despite one run in with law enforcement in his youth.  Lawyers-lawyers who work for the FBI, that lie on applications for FISA warrants for political reasons, are not sentenced to prison in this Court-they get probation. *See USA v. Kevin Clinesmith*,  20-CR-165 (JEB).[9]   Mr. Clinesmith-a lawyer who worked for the FBI walked out of federal courtroom in this courthouse a free man without spending a day in prison. That's a disparity the size of Texas. That's not to suggest that this honorable Court should therefore give Mr. Allen a free pass. No, no, no. What it says is that Mr. Allen should be punished for his conduct when taking into account all the facts of his particular conduct and no one else's. *See* Disparity*, infra.*

The government must concede that he destroyed no property, even though he was in the proximity of others committing violence. He did not suit up for combat.  He was not armed.  He wore clothing that was not designed for J6, but

---

[8] After the events of January 6th, Mr. Allen did nothing but keep quiet and mind his own business in stark contrast to many other J6'rs whom this Court has sentenced. He didn't go on Tucker Carlson or any other show, Most importantly, he never will.

[9] Our system of law needs to address this anger which our legal system is not really set up to address. The only people upset about the FBI lawyer getting probation were other lawyers. But when J6 defendants are sentenced it seems the whole world is upset.

that he'd worn before at other rallies and at work.  Without representation of

counsel, he discussed his conduct by answering pointed questions by multiple FBI

agents. He has never violated  his conditions of release.    He did not post anything

on social media or brag to friends after January 6.

This has obviously been a tough road for Mr. Allen and his family.    He has a

very simple life: he works hard as a small business owner to make ends meet  and

tries at every turn to improve himself, support his family,  and be a servant of God

by volunteering.  It is of utmost importance to him that this Court and fellow citizens

understand that he is incredibly saddened and remorseful about what took place on

January 6, 2021. *See* Mr. Allen's letter, exhibit 1. People died, and law enforcement

officers and protesters suffered multiple injuries. None of his actions will be erased

from the internet. It's there forever.  He has been the subject of a number of media

accounts lumping him with others that were violent, ruthless and well-orchestrated

that were there on January 6, 2021 for violent purposes. His personal character and

reputation  will  forever  be  tarnished.    This  despite  a  lifetime  of  helping  his

community and being a good neighbor as shown in the letters of support from his

community, family, and friends.  *See* letters in support, exhibit 2.  Since his arrest,

and the media coverage his charges received, his family have been threatened and

he has suffered personal attacks in this same community. He is now afraid of going

to his local Lowe's because of one such incident.  It doesn't take a long prison sentence for one to feel remorse or learn from their mistakes.

In determining what punishment is warranted, this Court should not lose sight of the fact that he intended no harm and has lived a life with little criminal conduct. He has been a model of good behavior on pretrial and post-trial release. His past behavior and his post arrest behavior show that he is a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of imprisonment under the guidelines and a term of supervised release of two years considering the 3553 factors.   Mr. Allen is fortunate. He has the support of his family. Many defendants that appear before this Court don't have that gift.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that

leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A sentence within the guidelines, restitution and supervised release does constitute punishment and it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms while on supervised release. He has been on pretrial release for nearly two years with many restrictions and has complied with them completely.

The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Allen's likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition. His acceptance of responsibility was

swift, complete and without reservation and exercising one's constitutional right to go to trial should not be used against him.  A felony conviction will change his life forever. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given his  current age, little criminal history, being married, and other issues consistent with what is mentioned above, the

likelihood that he would ever re-offend is as close to zero as one might come.[10] A punishment within the guidelines in this case is going to have the exact opposite effect than what is in the interest of justice. Mr. Allen urges the Court to impose a sentence within the 0-6 month guidelines in light of his non-violent conduct at the Capitol, his immediate cooperation with the FBI, and the lack of a need to further deter him.

### 3. Just Punishment

Mr. Allen now has a felony conviction which, in and of itself, is quite punitive. The conviction affects possible future job opportunities and will remain with him for the rest of his life. Since his livelihood depended on doing some contracting work for the Federal government he may never financially recover. He can't vote, serve on a jury or carry a gun. But supervised release will allow him to continue to work and support his community and continue the volunteering he does in his church and in his community. If incarcerated for a long period of time, there will be only more suffering.

Given sentences imposed in comparative cases, a sentence below the 10-16 month guidelines is not unusual and is appropriate here. *See* Disparity, *infra*.

---

[10] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

And after one serves their time, there is supervised release to follow. This involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's rules of the road. *Jones v. Cunningham,* 371 US 236, 242 (1963). Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. *Ibid*. Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison again. *Ibid*. This Court makes that clear by having re-entry hearings for criminal defendants that appear in this Court. And experience of undersigned counsel shows that these hearings work.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. [Supervised release] significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

A. **The kinds of sentences available**

A  guidelines sentence of between 0-6 months would  result in sentencing

disparity with other individuals who behaved similarly but were not similarly

charged.  That is, they behaved worse and were allowed to plead to misdemeanors.

*See infra*.

Imposition of a fine is discretionary, and, defendant respectfully submits, he

cannot pay a fine in this case since he has lost his income.

B. **The need to avoid unwarranted sentence disparities**

If this Court were to impose a sentence greater than the guideline range,

supervised release, community service, and/or restitution, it would create an

unwarranted sentencing disparity compared to similar cases that have already gone

to sentencing  or are pending in this Court.[11]  Paragraph 144 of the PSR states that

---

[11] For example, *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6
defendant pushed police officers and made contact with them yet the government
chose not to pursue those charges and he was given 3 months incarceration and
allowed to keep his class B misdemeanor deal. Here's what he posted: "was there
for over a half hour. I got gassed several times inside, many times outside the
Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police
inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group
unaffiliated with the government brought to their attention additional violent
conduct by Mr. Reeder, and the government asked to continue the sentencing
hearing. Ultimately, despite concrete evidence of violence, the government chose
not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages
30-41. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-
5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31,
p. 2. But "Leffingwell was not content to merely stand inside the threshold":
Positioned at the front of the line of rioters stacked hundreds deep behind him,
Leffingwell chanted at the officers standing before him to "join us!" in the rioters'
efforts to assault the Capitol. When some in the crowd shouted for the rest of the

the median length of imprisonment of defendants whose primary guideline was

2A2.2, is 48 months. This is incorrect as applied to J6 defendants. This statistic

includes all defendants, regardless of charge, involving completely different

circumstances and from other jurisdictions that were calculated under this same

guideline and same criminal history category. As this Court knows, each case must

stand on its own facts. In other cases that were prosecuted before other Judges of

this Court that included the 231 count and the misdemeanor counts had worse

---

crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll
never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel
Leffingwell and the gathering crowd, Leffingwell struck both officers in the head.
*Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in
the head, and then as he continued to swing, he punched Officer W.H. in the head,
before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so
brazen that he was one of the few protesters arrested on the scene. *Id.,* p. 9.
Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government
sought a sentence of 27 months' incarceration. *Id.,* p. 2. The Court imposed a
sentence of six months' incarceration with credit for time served, followed by 24
months of supervised release. Allen's conduct was nowhere near this.
Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a
Confederate flag, Blair walked up to a police line outside the Capitol. He turned
towards an officer and said, "What's up motherfucker, what's up, what's up
bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the
defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest
recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair
pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five
months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted
as intended to inflict bodily injury or to threaten it.

conduct than Mr. Allen. Take for example the case of *USA v. Reyher*, 23-138 (RBW).  According to the statement of facts attached to Rehyler's plea agreement, ECF No. 87,  and the government's sentence memo, ECF No. 153, Mr. Reyher encouraged other rioters to "push" and he entered the tunnel three times.  *See Id,* p. 3. According to the government, Mr. Reyher "continued to fight the officer line." *Id.* He in concert with his wife remained at the front of the mob [in the tunnel] for a full six minutes. *Id.* at 9.  "Aurthur Reyher made it face-to-face with the police line and thrust his body directly into police officers… and were "inches away" from the officer stuck in the door." *Id.* This is nicely illustrated in the government's sentence memo. He and his wife also yelled "our house" *Id.* They also "lock[ed] arms or bodies with each other as the rioters-move[d] backwards in unison before rocking and pushing forward together." *Id.* at p. 12. "Arthur Reyher raised his hands and yelled to other rioters, "don't hit 'em! KEEP YOUR HANDS UP AND PUSH!" *Id.* at 13. Mr. Allen did not engage in any of this behavior. Incredibly, Reyher also showed other rioters how to do this. *See id*., images at 17-18 and p. 14. He chanted "USA USA" and "our house." *Id.* Again, Mr. Allen did none of this. Reyhler also "patted rioters on the back as they entered the tunnel."[12] *Id.*

Finally, as if the above was not enough, "Reyher then again, rejoining the rioters at the mouth of the tunnel…encouraged rioters…yelled at the crowd, waved

---

[12] It appears Reyhler was in the tunnel from 2:43 pm and 3:21 pm and spent approximately hour there.

rioters toward the tunnel and passed a bullhorn to a rioter at the front of the police

line. " *Id.* at p. 21. Again, Mr. Allen did nothing of the sort. The cases are not even

close yet the charges against Mr. Allen are more severe for some unknown reason.

Mr. Allen's  culpability appears to be minimal in contrast with rioters who

posted hateful messages, destroyed or stole government property and actually

assaulted or threatened the law enforcement officers on that date.  These cases

demonstrate that the sentence requested by the government is greater than

necessary. Comparing Mr. Allen's behavior to the panoply of January 6

defendants, his conduct was  less serious than those who brought weapons with

them and caused injury to officers. He also stands apart from many January 6

defendants in that he did not glorify or minimize his conduct after the fact.

## V. CONCLUSION

We are not asking that this Court let Mr. Allen off the hook for his bad

conduct. He respectfully moves this court to impose a sentence  below the

adjusted guidelines, 24 month's supervised release, 200 hours of community

service,  and no restitution.  This sentence  is "sufficient but not greater than

necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best

tradition of federal judicial discretion, that would consider Mr. Allen as an

individual and account for his unique failings and positive attributes that, in the

words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and

the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J.

concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

<div style="margin-left:40%">

Respectfully submitted,


By:    /s/  *Kira A. West*
     Kira Anne West
     DC Bar No. 993523
     712 H. St. N.E., Unit #509
     Washington, D.C. 20005
     Phone: 202-236-2042
     kiraannewest@gmail.com

     */s/ Nicole Cubbage*
     Nicole Cubbage
     DC Bar No. 999203
     712 H. St. N.E., Unit #570
     Washington, DC 20005
     703-209-4546
     Cubbagelaw@gmail.com

</div>

<div align="center">

CERTIFICATE OF SERVICE

</div>

I hereby certify on the 7th day of November, 2024 a copy of same was

delivered to the parties of record pursuant to the rules of the Clerk of Court.

<div style="margin-left:40%">

*Kira West*            /S/
Kira Anne West

</div>