## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-261-APM** |
| **TERRY ALLEN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Terry Allen to 70 months of incarceration, three years of supervised release, $2,000 of restitution, and a $210 special assessment.

The government's recommended sentence at the midpoint of the recommended Sentencing Guidelines range, as calculated by the U.S. Probation Office and the government, is warranted due to the prolonged nature of Allen's violent conduct, his history of violence, and the critical need to deter Allen and others from ever engaging in such conduct again.

### I.    INTRODUCTION

The defendant, Terry Allen, was part of the vanguard of the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million

1

dollars in losses.[1]

Allen traveled from his home in Pennsylvania and helped to violently overrun the U.S. Capitol on January 6, 2021. As a joint session of Congress convened to certify the Electoral College results in the 2020 election, Allen was at the forefront of the crowd that breached the restricted perimeter established around the U.S. Capitol.

Once on Capitol grounds, Allen fought with police at every opportunity, adding to the frenzy on the West Plaza of Capitol grounds that eventually forced police in the area to abandon its police line and retreat. Allen aggressively confronted and shouted in the faces of officers, he used his wooden flagpole to jab at officers, and he found a metal pole and carried it with him until, when the opportunity arose, he hurled it at officers from feet away. The government recommends that the Court sentence Allen to 70 months of incarceration. This is a significant period of incarceration, but it adequately reflects the gravity of Allen's conduct and is necessary to adequately deter him and others from repeating such conduct in the future.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the complaint filed in this case, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.  ALLEN's Role in the January 6, 2021 Attack on the Capitol**

*i.  Conduct prior to January 6*

Following the 2020 presidential election held on November 3, Allen traveled to Washington, D.C. on multiple occasions in leadup to January 6. Allen traveled alongside other members of the Pennsylvania chapter of the Salt & Light Brigade, an offshoot of the far-right Pass the Salt Ministry[2] that emphasized political confrontation using military rhetoric. First, on Nov. 14, 2020, Allen traveled to D.C. for the "Million Maga March," a lawful protest that was followed by violent clashes between protestors and counter-protestors later that evening. On a livestream that evening, Allen was captured wearing a red-white-and-blue cowboy hat with "Trump" printed on the front, yellow reinforced gloves, and a neon t-shirt that read "Jesus's Sheriffs Posse … Salvation." Ex. 313. Allen also carried the same wooden flagpole he would carry and use on January 6. In the livestream, Allen can be heard shouting "Antifa!" before holding up his gloved fist to display his reinforced gloves and stating that he wanted to "try these new gloves out." Allen also stated that he was there to "kick some ass and take names" and "I don't believe in Romans 13 that we're supposed to just sit down and bow from it. When you see sin, you get in their face and let them know." *Id.*

---

[2]  The Southern Poverty Law Center previously identified Pass the Salt Ministry as a hate group. https://www.splcenter.org/states/ohio.



*Image 1 (left) – Reinforced gloves recovered during search of Allen's residence; Image 2 (right) – Allen wearing reinforced gloves on Nov. 14, 2020 (Ex. 313 at 1:41)*

Allen and members of the Salt & Light Brigade traveled again to D.C. on Dec. 12, 2020 for another large Stop the Steal demonstration. Allen was recorded on the east side of Capitol grounds near an area restricted with metal bike racks discussing alleged fraud in the 2020 election.

### ii. *January 6, 2021*

On January 6, 2021, Allen was first captured on the Capitol's security cameras near Garfield Circle at 12:43 p.m., before the restricted perimeter around the Capitol had been breached, and while former President Trump was still speaking near the White House. Ex. 202. At that time, a growing crowd had gathered on the west side of the restricted perimeter between Peace Circle and Garfield Circle. Allen stood speaking with unidentified individuals as he leaned against his wooden flagpole with the below-depicted Trump flag tightly wrapped and secured around it. Allen wore a white sweatshirt (Ex. 903), yellow reinforced gloves (Ex. 901), an army green backpack, and a camouflage "Trump" hat.

At 12:53 p.m., CCTV footage at Garfield Circle showed several individuals begin moving

east in the direction of the Capitol. Allen disengaged from his conversation and walked quickly in the same direction.

At approximately 12:53 p.m., Allen moved from Garfield Circle to stand feet away from the barriers demarcating the restricted perimeter around the Capitol building. Ex. 202. At approximately 12:54 p.m., Allen moved past a first layer of bike rack barricades, directly in front of a stone wall and two layers of snow fencing. Ex. 203. Signs on the snow fencing read "Area Closed". July 8 Tr. 49-50. Allen was so close to the snow fencing that he used his flagpole to hit it. Ex. 203.



*Image 3 – Ex. 203 at 12:54:56 p.m.*

Allen and others near Garfield Circle breached the perimeter just moments after the first violent breach of the perimeter occurred nearby at Peace Circle, also on the west side of the Capitol building. CCTV from security cameras overlooking the West Plaza showed rioters reaching the area at approximately 12:55 p.m. Ex. 206-A. Two minutes later, Allen walked across the lawn on the west front of the Capitol building, Ex. 203, and at 12:58 p.m., he reached the West Plaza.



*Image 4 – Ex. 204 at 12:57:41 p.m.*

Once on the west front, Allen stood on top of a low stone wall watching as other rioters crowded against police officers who had established a line behind black fencing that had been put up for the inauguration. Ex. 204; July 8 Tr. 97. When Allen saw rioters overrun this fence line at 12:59 p.m., Allen jumped down from the wall and quickly advanced into the lower west terrace. Ex. 204.



*Image 5 – Ex. 206-A: Allen running toward breach point in black fencing at 12:58 p.m.*

Allen quickly moved with other rioters toward scaffolding erected over the Southwest Stairway, which police had blocked using metal bike racks. Between 12:59 and 1:05 p.m., Allen was visible near the front of the crowd closest to the scaffolding. At 12:59 p.m., Allen appeared to be involved in a scuffle with other individuals. At 1:01 p.m., Allen and other rioters moved bike racks away from the scaffolding and into the crowd, and then Allen spoke to an officer defending the stairway, gesturing aggressively at him. Ex. 204. At 1:02 p.m., he could be seen holding his arms up at a 90-degree angle, yelling, and then stomping at something on the ground. Ex. 204.

### a.  1 p.m. Flagpole Attack[3]

At 1:03 p.m., Allen moved north from the Southwest Stairway scaffolding into the crowd gathered against a line of officers. No bike racks were being used to maintain the police line at this point, so there was no barrier between police and rioters. At 1:04 p.m., a brief fight broke out between rioters and officers, and Allen quickly moved forward to join, though the video evidence is unclear as to the extent of Allen's involvement in this altercation.

At 1:05 p.m., Allen stepped up onto a slightly raised platform at the southeastern corner of the West Plaza where rioters had gathered directly against police. Allen approached the officers and appeared to engage them in conversation as he aggressively gestured in the direction of the Capitol building. Seconds later, a short scuffle broke out, and Allen shoved two officers before being pushed back into the crowd.

---

[3] As set forth in more detail below, the Court acquitted Allen of Count Two, assaulting, resisting, or impeding officers with a deadly or dangerous weapon. Nevertheless, the Court did find that in this melee between rioters and police, Allen made jabbing motions in the direction of officers with the flagpole after which he stumbled back and "then remain[ed] in the melee and continue[d] to thrust his flagpole forward for at least another ten seconds." In finding Allen guilty of Count One (Civil Disorder), the Court concluded that this conduct obstructed and interfered with the USCP officers in the melee.



*Image 6 – Ex. 206-A – Allen shoving officers at 1:05 p.m.*

After being pushed back several feet away from officers, Allen then turned his flagpole to hold it horizontally in two hands, with his right hand in front of his left. At this time, there were two objects on the ground at the feet of the officers next to him—a police radio dangling from an officer and a second black object of similar size—and Allen attempted to use the flagpole to reach toward one or both of the objects in an attempt to retrieve them. Ex. 301 at 18 seconds; Ex. 206-A at timestamp 1:06:03 p.m.



*Image 7 – Ex. 301 at 18 seconds – Allen reaching toward objects at officers' feet with flagpole*

Allen then took one step backward, briefly placed a hand on the back of the rioter next to him, and switched his posture holding the flagpole, with his left hand in front of his right. Allen then used the flagpole to jab twice at the lower torsos of officers several feet to the left (from the officers' perspective) of the objects Allen had attempted to retrieve seconds earlier. Ex. 301; Ex. 206-A at timestamp 1:06:15 p.m. [4]

---

[4] Among the U.S. Capitol Police officers Allen attacked was Sergeant Aquilino Gonell, who the government anticipates will submit a Victim Impact Statement related to this altercation.



*Image 8 – Ex. 301 – Allen thrusting flagpole into officers at approx. 1:06:15 p.m.*

After Allen's second jab toward officers, Allen stumbled backwards and briefly stepped off the small, raised platform. Allen then stepped back onto the platform, positioned himself behind two rioters directly engaged with the officers, and continued to jab in between the two rioters at the lower torsos of officers multiple times over the next 15 seconds as the rioters drove the officer line several feet backwards. Ex. 206-A at timestamp 1:06:21–37 p.m.; July 11 Tr. 562. This moment was recorded by USCP officers positioned on the Lower West Terrace overlooking the violence, Ex. 301 and 302, in which an officer near the camera can be heard stating as Allen's attack was concluding that an individual was "using the flag as a spear." Ex. 301 at 55 seconds.



*Image 9 – Ex. 302 – Allen jabbing officers with flagpole at approx. at approx. 1:06:25 p.m.*

### b. *Allen removes metal fencing from police line*

Even after engaging in this melee, Allen did not leave the Capitol grounds and continued to engage with officers. At approximately 1:10 p.m., after the arrival of multiple Metropolitan Police Department ("MPD") officers to assist USCP, police were able to force rioters back toward the outer edge of the West Plaza and establish a police line using bike rack barricades. The police line was near the black metal fencing originally erected in the area, though portions of it had been torn down or removed by rioters by that time. Allen was visible near this police line at approximately 1:13 p.m.



*Image 10 – Ex. 400 – Allen near police bike-rack barricade on West Plaza at 1:13 p.m.*

At 1:23 p.m., Allen approached this police line, picked up multiple sections of this fencing, and carried them back into the crowd of rioters.



*Image 11 – Ex. 405 – Allen carrying fencing away from police line at 1:23 p.m.*

### c.   *Allen throws metal pole at officers*

At approximately 1:38 p.m., Allen reapproached the police line on the West Plaza—this

time near the middle of the crowd, in front of the large media tower. USCP and MPD officers were positioned behind a bike-rack barricade, and rioters crowded against the opposite side. Ex. 402. Allen was visible holding a black metal bar consistent with a piece of the black fencing he had previously removed from the police line, in addition to his wooden flagpole. Ex. 402.

At approximately 1:56 p.m., a fight broke out between rioters and officers along the police line. Ex. 402. Allen turned his flagpole and the black metal bar parallel to the ground and facing officers, consistent with how he had held his flagpole in the first attack. Ex. 402, July 8 Tr. 211-12. At trial, MPD Sergeant Anthony Alioto testified that he was present on the police line across from Allen and perceived Allen's manner of holding his flagpole as indicative of an intent to potentially attack officers with it. July 8 Tr. 210-12. Officers deployed pepper spray in Allen's direction. Ex. 402. Near simultaneously, Allen turned his body sideways toward several of the officers, wound up, and threw the metal bar at the officer line standing feet from him. Ex. 402. Video footage showed the pole make contact with at least one officer. Ex. 206-C. The pole was capable of causing serious bodily injury to an officer. July 8 Tr. 141, 213.



*Image 12 – Ex. 402 at 1:56:42 p.m.*

After the attack, Allen retreated into the crowd, still within the restricted area. Ex. 206; July 9 Tr. 370.

### iii.    *Arrest of Allen*

On July 6, 2023, Allen was arrested for his conduct on January 6. Because of concerns for agent and officer safety, Allen was arrested via traffic stop, then the FBI conducted a search of Allen's residential property, which contains multiple structures. Law enforcement personnel found 19 firearms, M-class fireworks, gunpowder, and 10,000-20,000 rounds of ammunition. Included among these firearms was an AR-15 featuring an image of former President Donald Trump in an 18th century military officer's uniform surrounded by the text, "45th PRESIDENT DONAL J. TRUMP – 1776 REBORN – JANUARY 20, 2017."



*Image 13 – Firearm recovered from Allen's residence on July 7, 2023*

### III.    THE CHARGES AND CONVICTIONS

On October 2, 2023, a federal grand jury returned an indictment charging Allen with eight counts: Civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count Two); Assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count Three); Entering or remaining in a restricted building or grounds with a dangerous weapon, in violation of 18 U.S.C.§§ 1752(a)(1) and (b)(1)(A) (Count Four); Disorderly or disruptive conduct in a restricted building or grounds with a dangerous weapon, in violation of 18 U.S.C.§§ 1752(a)(2) and (b)(1)(A) (Count Five); Engaging in physical violence in a restricted building or grounds with a dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Count Six); Disorderly or disruptive conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven); and an act of physical violence in the Capitol grounds or building, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight). On July 11, 2024, following a bench trial on the above charges, the Court found

Allen guilty of Counts 1 and 3–8, but acquitted Allen of Count 2.

## IV.    STATUTORY PENALTIES

Allen now faces sentencing on Counts 1 and 3–8. Paragraphs 102 through 113 of the Presentence Report note the maximum penalties faced by Allen.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Presentence Report ("PSR") calculations of the Sentencing Guidelines. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Allen engaged in violence, including his assaultive conduct forming the basis of his conviction on Count Three for assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon in violation of 18 U.S.C. § 111(b).

The U.S. Probation Office calculated Allen's criminal history as category I, which is not disputed. PSR ¶ 58. Accordingly, based on the PSR's calculation of the defendant's total adjusted offense level at 26, Allen's Guidelines imprisonment range is 63–78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

17

A.       **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Allen's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Allen stormed the Capitol grounds at the very outset of the riot, and he repeatedly and violently interfered with police's defense of the building. When he saw opportunity to encroach further toward the Capitol—when the perimeter was breached, when police lines were overrun, when fighting broke out—Allen acted swiftly to join. Allen's conduct is made all the more troubling by its context and objective: to stop Congress from certifying the election. The nature and circumstances of Allen's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 70 months of incarceration.

B.  **The History and Characteristics of the Defendant**

a.  **Allen's Criminal History**

The instant offense is not Allen's first violent assault against law enforcement. On Dec. 23, 1983, when a State College police officer attempted to arrest Allen for public drunkenness, Allen wrestled the officer to the ground, got on top of him, gripped the officer's neck with both hands and choked him, and then brutally and repeatedly slammed the officer's head into the concrete pavement of a Burger King parking lot. He was charged with aggravated assault and eventually pled guilty to simple assault in a combined plea that also resolved a drunk driving charge the following year. State records indicated he served a sentence of six to eighteen months of incarceration on the assault conviction.

18

b. **Allen's Family Circumstances**

Allen's spouse, M.A., told Probation that a term of incarceration would create undue hardship for her because, due to reported back issues, Allen's presence was required at home for physical tasks like maintaining their furnace and shoveling their private driveway during winter.[5] PSR ¶ 71. This concern, even if it were to be substantiated and detailed with medical records, does not warrant a variance or departure. The Allens' two adult children and their spouses both live on the same street as their parents. It can hardly be said that M.A. would be left without available assistance with her furnace or snow shoveling, particularly from her son, who operates an excavating business and whose property line touches that of his parents.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Allen's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general

---

[5] The defendant discussed his physical health in a response to the government's motion for detention, but the PSR raises no particular concerns about the defendant's health aside from some minor maladies, many of which are no longer present (e.g. appendectomy at age 14). The defendant has not provided any medical records that would substantiate a claim that he is ill or otherwise in failing health.

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Allen's criminal history—a brutal and prolonged assault on a police officer—while old, indicates that his conduct on January 6 was not an aberration. When confronted by law enforcement, his reaction is to lash out. His conduct on January 6 and in the months leading up to it showed an enthusiasm for committing such violence for political purposes—to fight leftwing protestors and to block the certification of a presidential election. The impacts of January 6 on our country are myriad and readily apparent even today in no small part because of Allen and others who came to D.C. intent on political violence. Allen has expressed no remorse for this, and there is no basis to assume Allen would be less likely to do so again if given the opportunity. A substantial term of incarceration is warranted to prevent and deter Allen from repeating his conduct.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Odin Meacham*, 21-cr-287 (JDB), Meacham was convicted at trial of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) and related offenses for joining the widespread attack on officers manning the West Plaza police line. At approximately 2 p.m. on January 6, Meacham hit a Capitol

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Police Officer with a wooden flagpole at the Lower West Terrace. Meacham then threw a metal pole and hit an MPD Officer. Shortly afterwards, Meacham approached a separate line of officers, yelled "lean in" and grabbed an MPD Officer's baton. Meacham also yelled profanities at officers on the line as well.

Allen's conduct is comparable in several respects to Meacham. Both men engaged officers on the West Plaza police line at multiple points, both men used a flagpole in one altercation, and both men assaulted officers by throwing a metal pole at them. Both showed an overt hostility toward the officers—through both their shouting, aggressive conduct, and assaults—at a time when officers were attempting to defendant the Capitol despite being desperately outnumbered. Both Allen and Meacham refused to accept responsibility for their actions and proceeded to trial, where they were convicted of violating Section 111(b), in addition to felony offenses under 18 U.S.C. §§ 231(a)(3) and 1752. Although Meacham was convicted of two counts of Section 111(b) and one count of Section 111(a), Meacham had no notable criminal history prior to his conduct on January 6, and the Court stated that Meacham's conduct was informed by a traumatic upbringing and was mitigated by unique collateral consequences Meacham experienced after January 6. Meacham's recommended Guidelines range was 87 to 108 months' incarceration, the government recommended a sentence of 96 months, and the Court sentenced Meacham to 72 months.

In *United States v. Julian Khater,* 21-cr-222 (TFH), Khater was convicted of two counts of assaulting, resisting, or impeding officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Like Allen, Khater engaged in multiple violent altercations with officers on January 6, and used a deadly or dangerous weapon in the process. Khater—like Allen—actively, repeatedly, and violently participated in the mob's efforts to breach the police line on the west

front of the Capitol building. Khater eventually accepted responsibility for his violent actions on January 6, unlike Allen. Judge Hogan sentenced Khater to 80 months of incarceration.

Finally, in *U.S. v. Andrew Taake,* 21-cr-498 (CJN), the defendant was convicted of one count of assaulting, resisting, or impeding officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Like Allen, Taake violently assaulted law enforcement on the West Plaza between 1 and 2 p.m. on January 6, and used a deadly or dangerous weapon. Through their assaults on officers, both men contributed to the breach of the U.S. Capitol on January 6 by contributing to the overwhelming level of violence officers faced on the west front. While Taake received a three-point offense level increase for inflicting bodily injury, he also received a two-point reduction for acceptance of responsibility. The Court ultimately concluded that Taake's total adjusted offense level was 27, and sentenced him to 74 months of incarceration.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Allen was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See United States v. Webster*, 1:21-cr-00208 (APM), September 1, 2022 Sentencing Tr. (requiring January 6 defendant convicted of a offenses including a 111(b) to pay $2,000 in restitution to the Architect of the Capitol because "everybody who was there in a sense whether they directly destroyed property or not, certainly contributed and caused [destruction to the Capitol building]."); *United States v. Todd*, 204 WL 3566223, 22-cr-166 (BAH), at *3 (D.D.C. July 29, 2024); *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Allen to pay $2,000 in restitution for his

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts 1 and 3–8. This amount fairly reflects Allen's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Allen's convictions outlined in Part III subject him to a statutory maximum fine of $250,000 for Counts 1, 3, 4, 5, and 6, and a maximum fine of $5,000 for Counts 7 and 8. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine.[10] § 5E1.2(a), (e). The

---

[10] Probation concluded in the draft PSR that Allen does not have the resources to pay a fine due to the illiquid nature of his assets, which are held jointly with his wife. ECF No. 56, ¶ 101.

Guidelines fine range for this offense is $25,000 to $250,000.

IX.    **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 70 months of incarceration, three years of supervised release, $2,000 of restitution, and a $210 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Hutton Marshall*
JOSEPH HUTTON MARSHALL
KATHRYN E. BOLAS
Assistant U.S. Attorneys
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov